**In the Matter of 1616 REMINC LIMITED PARTNERSHIP, Debtor-in-Possession.**

**UNITED STATES ELEVATOR CORPORATION, Plaintiff,**

v.

**1616 REMINC LIMITED PARTNERSHIP, Defendant.**

**Bankruptcy No. 75–659–A.**

United States Bankruptcy Court,
E. D. Virginia.

Feb. 23, 1981.

H. Bradley Evans, Jr., Alexandria, Va., for plaintiff, United States Elevator Corp.

James A. Newell, Arlington, Va., for defendant/debtor-in-possession.

## MEMORANDUM OPINION

MARTIN V. B. BOSTETTER, Jr., Bankruptcy Judge.

The defendant, 1616 Reminc Limited Partnership ("Reminc") is a debtor-in-possession in a Chapter XII proceeding under the Bankruptcy Act presently before this Court. The plaintiff, United States Elevator Corporation ("USE"), initiated an action against Reminc by way of an Amended Complaint filed on July 9, 1976, seeking a recovery in the amount of $177,885.00.[1] Reminc filed a counterclaim in the amount of $1,500,000.00 and also served The American Insurance Company [Fireman's Fund] ("American") in a suit on a performance and payment bond, as surety, in connection with USE's contractual obligations for the installation of an elevator system in Reminc's principal asset, an office building.[2]

---

**1.** J. B. Jenkins, Manager of Contracts for Cubic Corporation (USE is a wholly-owned subsidiary of Cubic) testified that the amount due to USE under the contract was $112,343.09. An additional $65,356.00 was spent on overhead steel supports for the elevator system in the Xerox Building. He indicated that he would defer to the judgment of John A. Miller, an expert witness for USE, as to the amount recoverable for the overhead steel support construction. Miller opined that the actual amount spent on this particular aspect of the installation of the elevator system was $12,800.00. *See infra* at page 693.

**2.** By order entered May 17, 1977, the case of *1616 Reminc Limited Partnership v. American Insurance Company* was consolidated with this adversary proceeding and, accordingly, the finding of facts and conclusions of law in this adversary proceeding will be dispositive of the *American Insurance Company* case.

The building in question is located at 1616 North Fort Myer Drive, Arlington, Virginia, and is commonly referred to as the "Xerox Building".

USE is a wholly-owned subsidiary of Cubic Corporation. On March 16, 1973, USE entered into a subcontract with Citcon Corporation, the general contractor for Reminc during the construction of the Xerox Building. Under this subcontract, USE agreed to install two hydraulic and six electric elevators in the Xerox Building.

This Court determined, by an Order entered on January 15, 1977, that USE's waiver of mechanic's lien rights was validly and properly executed by USE. This had the effect of disallowing USE's claim as a secured claim against Reminc's real estate.

Prior to this Court's decision invalidating USE's mechanic's lien, USE made application to be treated as an unsecured creditor under Rule 12–30 of the Rules of Bankruptcy Procedure by virtue of an assignment entered into by the general contractor of the Xerox Building, Citcon Corporation ("Citcon"), as assignor, and Reminc as assignee. Reminc obtained this assignment on August 6, 1976.

On August 15, 1975, Reminc filed a petition initiating the proceedings before this Court. The Plan of Arrangement was confirmed on May 19, 1976.

Several issues are before the Court for resolution. First, is American liable, as surety, on any defects in construction on the part of USE in installing the Xerox Building's elevator system? Second, does USE remain liable as a principal under the performance bond even if the surety is released therefrom? Third, can USE's claim as an unsecured claimant be asserted against Reminc as assignee? Fourth, has USE established that the installation of the elevator system was accomplished in a workmanlike manner and in accordance with the terms and specifications of its subcontract? Fifth, is Reminc entitled to damages as alleged in its counterclaim against USE?

Admitted into evidence is a "Contract Bond—Dual Obligee" between Reminc and American. USE is the principal under this bond. American agreed therein to furnish a bond in the amount of $459,000.00 for the performance of USE's obligations under the contract. Paragraph six (6) of the bond states that:

"[N]o suit, action or proceeding shall be had or maintained against Surety [American] on this bond unless the same be brought or instituted within one (1) year after the date of the completion of the work by Principal or after the date of any default by Principal in the performance of the contract."

It is uncontroverted that Reminc signed temporary acceptances of the elevator system, dated August 16, 1974. Reminc later signed a final acceptance of the hydraulic elevators on March 15, 1974, and the six elevators on February 24, 1975.

In Virginia, a provision in a bond "which bars recovery from the surety after the expiration of one year following the date on which" the principal completed work on its contract is valid. 3A Michie's Jur., *Building Contracts*, § 22 (1976 Replacement). *See Contee Sand and Gravel Company, Inc. v. Reliance Insurance Company*, 209 Va. 672, 166 S.E.2d 290 (1969).

Reminc argues that within the context of the Chapter XII proceedings, it asserted USE's liability for defective performance as part of its Objection to Claim, filed on January 26, 1976. To come within the one-year period mandated under the bond, would require Reminc to establish that its filing of an objection to claim on January 26, 1976, effectively tolled the statute as to American. USE asserts that Larwin Mortgage Investors (not a party to the bond) initially filed the objection, rather than Reminc. It follows that since American was not named as a party in the suit until Reminc filed suit on the bond on November 9, 1976, American was without notice that its obligations under the bond had been invoked.

Reminc further argues that its acceptance of the elevator system does not consti-

tute a completion of the work by USE, and asserts that since USE continued to work on the elevator system after final acceptance, it is within the one-year statute of limitation under the bond. In support of its position Reminc relies upon the testimony of L. William Cork, as it appears in a deposition *de bene esse.* Cork, an elevator adjuster with USE in 1975, was sent to the Xerox Building to make corrections in the elevator system. He was employed in USE's contract and engineering section, rather than its maintenance section. Reminc urges that this fact evidences continued activity.

Admitted into evidence is a document entitled "Service Department Contract A," a maintenance agreement between USE and Reminc, dated June 6, 1974. Attachment I to this contract states in part that "[t]his contract includes three (3) months free service which will commence on the date each elevator is inspected, accepted and placed into permanent operation."

The Court takes cognizance of a letter addressed to J. B. Jenkins (an employee of Cubic Corporation) from Evans L. Morrison (an employee of Performance Profiles, Inc., an expert witness for USE), dated April 29, 1976, wherein Morrison states that "[f]ine tuning adjustments should not be considered as having a relation to completion. It is normal to accept equipment and have it 'touched up' later." Morrison also stated that "[b]ased upon the elevator performance data acquired at the job, there is no question that the individual cars and the elevator group are complete—the job is finished." Morrison reiterated the views expressed in this letter on direct examination in the instant proceeding.

Robert Calhoun Smith, the architect for the Xerox Building, endorsed numerous worksheets admitted into evidence entitled "Application and Certificate for Payment" for work completed between August 1, 1974 and October 30, 1974. Each of these documents indicated that one-hundred percent of the work on the elevator system had been completed. In a report to the General Partner of Reminc, dated July 24, 1974, the architect made a notation regarding two of the elevator cars to the effect that although there existed some bounce when a passenger entered the cabs, "[t]he elevators appear[ed] to be installed in accordance with the manufacturer's recommendations and shop drawings."

Having reviewed the record with respect to this issue, the Court concludes that the elevator system was essentially completed on the dates on which Reminc signed the final acceptances for the system. Therefore, the statute of limitations stipulated in the bond, having begun to run as of the final acceptance dates, acts as a bar to recovery by Reminc on the bond in the amount of $459,000.00 against American.

The Court next considers whether USE remains liable as a principal under the bond, even though American has been released from its obligation under the bond.

■ It is well settled that a surety's obligation under a performance bond "is primary and original as well as direct." *E. R. Christenson v. Diversified Builders, Incorporated,* 331 F.2d 992, 995 (10th Cir. 1964). The general rule is that "a creditor's right to proceed against the surety exists independently of his right to proceed against the principal." *Id.* In *Maule Industries, Inc. v. Cohen,* 117 So.2d 37, 39 (3d D.C.A. Fla.1960), the court stated:

"[T]he principal debtor is at all times liable for the entire and full debt. He is in no way relieved from any responsibility whatsoever by the fact that he has a surety who is secondarily liable.... Although consideration may be given by the creditor to the presence or absence of a surety in weighing as a business decision the advisability of contracting in the first place; it is immaterial to the question of primary liability of the principal to his creditor."

This principle of law is applicable to the situation at hand and, accordingly, USE is still answerable to any existing liability.

■ Next, the Court turns to the matter of Reminc's liability as assignee of Citcon.

It is USE's contention that Reminc had knowledge of the former's claim prior to the assignment and that the assignment by Citcon to Reminc can only be considered as an assignment of the entire contract, thus requiring Reminc to assume the liabilities of Citcon including the payment due USE. Reminc raises the counter contention that the invalidation by this Court of USE's mechanic's lien rights also extinguishes its claim and that the assignment which occurred after the filing of the petition cannot recreate a debt already extinguished.

Reminc's Chapter XII petition initiating these proceedings was filed on August 15, 1975. The Plan of Arrangement was confirmed on May 19, 1976. The assignment in question was obtained on August 6, 1976. The Complaint filed by USE[3] alleged a claim (the unpaid balance of funds owed by Citcon—the insolvent general contractor for Reminc—to USE) against Reminc which existed as of the filing of the petition, based upon a mechanic's lien on Reminc's real estate (principally the Xerox Building). This Court determined on January 25, 1977 that USE waived its rights under the mechanic's lien. Reminc contends, therefore, that there remains no basis upon which USE can claim to be a creditor as of the filing of the petition in order to share in the Plan's provisions for such creditors.

Reminc's position is that under Rules 12–30(a) and 12–11(a) of the Rules of Bankruptcy Procedure, USE must have in its possession a provable claim against Reminc as of the filing of the petition initiating these proceedings; that this proposition is a fundamental principle of bankruptcy law and "is totally dispositive of any creditor's right to have its claim allowed and share in distribution."

Reminc refers the Court to *United States v. Marxen*, 307 U.S. 200, 59 S.Ct. 811, 83 L.Ed. 1222 (1939). Although *Marxen* notes the proposition cited by Reminc, it does not resolve the issue at hand. *Marxen* involved a bankrupt maker of a note who defaulted on the said note which was given by a bank shortly before the former filed bankruptcy.

The United States, which guaranteed the loan, paid the bank and took an assignment of the note. The United States later filed a claim with the bankruptcy court in its own name. This claim was allowed as a general claim only. The *Marxen* court, in acknowledging the status of the United States as a general claimant, found that since the bank's claim was assigned after the bankrupt filed its petition, the United States' claim could not be given a priority over other claimants whose claims became fixed as of the date the bankruptcy petition was filed. Thus, based upon the question placed before the *Marxen* court, the United States' claim was not extinguished but only denied a priority.

■ The law in Virginia, by statute, clearly provides that the remedies granted by the Mechanic's Lien statute shall be cumulative and not in lieu of any other legal or equitable remedy. *Code of Virginia*, 1950, as amended § 43–23.2. The remedy of the mechanic's lien statute is to grant a priority and the extinguishing of such priority does not in and of itself extinguish the claim.

Reminc next argues that the assignment by Citcon is not an assignment of an executory contract giving rise to an assumption of performance obligations, but rather is an assignment of rights of action. The assertion is made that the assignment of a right of action to recover damages, as distinct from the contract itself, is a principle of long standing in Virginia. Reminc contends, therefore, that it should not be held affirmatively liable for any obligations of Citcon under the latter's subcontract with USE. It is in this context, by way of analogy, that Reminc refers the Court to *Code of Virginia*, 1950, as amended, § 8.2–210(2), which states that:

"A right to damages for breach of the whole contract or a right arising out of the assignor's due performance of his entire obligation can be assigned despite agreement otherwise."

---

**3.** USE filed an Amended Complaint to be considered as a general unsecured creditor.

The *Official Comment* to this section refers to the assignment of "rights which are no longer executory [and that] in such cases no question of delegation of any performance is involved."

Reminc also cites a decision by the Ninth Circuit, *United States for the Use of White v. Thompson & Georgeson, Inc.*, 346 F.2d 865 (9th Cir. 1965). In that case a subcontractor (Dunbar), involved in performing certain road construction work, assigned to one of its creditors (White) sums due and to become due under its subcontract. Contemporaneous with this agreement, White entered into another agreement with the general contractor (T&G). The latter party therein recognized the assignment between White and Dunbar. White, in the second agreement, agreed to become responsible for certain specific liabilities of Dunbar and agreed further to pay them within a reasonable time should Dunbar be unable to do so. Dunbar later abandoned the construction of the road leaving T&G to complete the project at its expense and to incur to expense of settling with Dunbar's creditors. When White sought to recover the subcontract amount less monies paid, T&G countered that not only were there no monies due but that White should be affirmatively liable for the deficit created by the excess of T&G's remedial and settlement expenses incurred over the contract funds left in its hands.

In reviewing the two agreements, the *White* court concluded that neither of these agreements contemplated that White was to receive any "contract money from T&G without offsets arising out of the accounts between Dunbar, the assignee and T&G." *Id.* at 869. Reminc relies upon the assertion made in *White* that "[m]erely as assignee one does not become affirmatively liable for a deficit in the accounts between his assignor and the other party to the assigned contract" as controlling in the instant matter. *Id.* Reminc observes that the *White* court found that the only possible basis for such a judgment would be a separate, express hold-harmless agreement between the assignee and the general contractor (i. e., similar to the agreement entered into be-

tween White and T&G, with White as surety for Dunbar, not as his assignee).

Reminc states that the assignment contains neither an affirmative assumption of contract obligations nor suggests a separate, independent contractual arrangement between it and USE. It is on this basis that Reminc disavows any liability on the August 6, 1976 assignment relied upon by USE.

USE, however, urges that *White* does not support Reminc's position. USE refers to the Ninth Circuit's understanding of White's principal contentions, to the effect that:

"White asserts (1) that Dunbar had substantially completed its subcontract and that therefore the balance of the contract price was nearly all earned and was due to White as Dunbar's assignee; (2) that White is not liable for the expenditures made by T&G to complete Dunbar's work . . . ."

*Id.* at 868.

USE argues that White was asserting that the assignment between White and Dunbar enlarged the original contractual liability of T&G. Under this view, White sought court approval for the proposition that despite the fact that T&G had to expend additional sums to complete Dunbar's work, T&G would, nevertheless, be compelled to make a double payment by virtue of the assignment. The *White* court rejected White's contentions by declaring that there was no demonstrated intention by either Dunbar or White that the project had been substantially completed. Nor did the court in *White* concur in White's assessment that he was not liable for the expenditures made by T&G to complete Dunbar's work by virtue of the agreement between White and T&G. USE argues that it is within this context that the *White* court, at 869, stated: "[m]erely as *assignee* one does not become affirmatively liable for a deficit in the *accounts* between his assignor and the other party to the assigned contract." (Emphasis added.) USE asserts that the application of the *White* holding to the facts of the in-

stant case would create a serious inequity and a result not intended by the *White* court.

USE takes the position that the contract assigned by Citcon to Reminc was executory in nature in that Reminc was fully aware, prior to the August 6, 1976 assignment, that Citcon had not paid the balance on the agreed contract amount owing to and due USE. USE notes that Reminc was cognizant of USE's claim inasmuch as Reminc listed a disputed mechanic's lien claim of $112,349.09 in its original petition.

USE relies upon *Rose v. Vulcan Materials Company*, 282 N.C. 643, 194 S.E.2d 521 (1973), wherein the North Carolina Supreme Court, in referring to transactions governed by the Uniform Commercial Code, adopted the rule expressed in the Restatement of Contracts, § 164 (1932). The *Rose* court, adopting this rule, stated:

> "[T]hat the assignee of an executory bilateral contract under a general assignment becomes not only the assignee of the rights of the assignor but also the delegatee of his duties; and that, absent a showing of contrary intent, the assignee *impliedly* promises the assignor that he will perform the duties so delegated. 3 Williston, *Contracts*, § 418A (3d ed. 1960)."

*Id.* 194 S.E.2d at 533 (emphasis in original).

Under the applicable provision of the Uniform Commercial Code, as adopted in North Carolina (G.S. § 25–2–210(4)), "an assignment of a contract in general terms is a delegation of performance of the duties of the assignor, and its acceptance by the assignee constitutes a promise by him to perform those duties." *Id.* 194 S.E.2d at 534.

The *Rose* court indicated that its findings "maintains a desirable uniformity in the field of contract liability." *Id.*

Virginia has adopted the Uniform Commercial Code provision construed by the *Rose* court—*Code of Virginia*, 1950, as amended, § 8.2–210(4). The *Official Comment* to this section states that this "subsection lays down a general rule of construction ... [with respect to] ... a normal commercial assignment, which substitutes the assignee for the assignor both as to rights and duties...."

The Virginia Supreme Court in *Economic Water Heating Corporation v. Dillen Supply Company*, 156 Va. 597, 159 S.E. 78, 81 (1931) observed that " '[w]hen a party assumes the contract, or undertaking, of another he makes it his contract.' " [4]

In *Keyes v. Scharer*, 14 Mich.App. 68, 165 N.W.2d 498, 501 (1968), the court stated that "[i]f an assignee does not expressly assume his assignor's obligations it becomes a question of interpretation whether he has impliedly agreed to assume such obligations." *See* 6 Am.Jur.2d, *Assignments*, § 109 (1964).

The general rule is "that an assignment of a contract does not operate to cast upon the assignee the duties and obligations or liabilities imposed by the contract on the assignee, in the absence of the assignee's assumption of such liabilities." 6 Am. Jur.2d, *Assignments*, § 109 (1964).

However, this principle is not applicable in the instant matter. The general rule is applicable to those situations where an assignor owes an assignee money and the assignor is unable to pay it. In order to

---

4. In further support of its position that Reminc assumed the burdens as well as the benefits of the assigned contract, USE refers the Court to Sections 11.1 and 12.1 of the contract between Citcon and Reminc which deals with the latter parties' reciprocal obligations to one another. Section 11.1 provides:

> "The Subcontractor [USE] shall be bound to the Contractor [Citcon] by the terms of this Agreement and the Contract Documents between the Owner [Reminc] and the Contractor and [the Subcontractor] ... shall have the benefit of all rights, remedies and

redress against the Contractor which the Contractor, by those Documents, has against the Owner...."

Section 12.1 of the contract provides:

> "The Contractor shall be bound to the Subcontractor by the terms of this agreement and of the Contract Documents between the Owner and the Contractor and shall assume toward the Subcontractor all the obligations and responsibilities that the Owner, by those Documents, assumes toward the Contractor...."

make good his obligation, the party in debt assigns his rights as assignor to the creditor as assignee. The purpose of the rule is to protect the bona fide purchaser (assignee) from being confronted with a large and unknown counterclaim. Certainly, this is not the case in the instant proceeding. The weight of the evidence adduced at trial indicates that Reminc was fully aware of USE's claim against Citcon. In any event, one authority states:

"It is not to be inferred from the [general] rule that the assignee of a contract is not personally responsible to the other party to the contract for the obligations imposed by the contract on the assignor unless he assumes such obligations, so that he may enforce the contract without the performance of the obligations which it imposes. On the contrary, he takes the right with all the burdens to which it was subject in the hands of the assignor, and if he undertakes to enforce the right by an action, he must show that the conditions have been performed either by his assignor or by himself."

*Id.* at § 111.

USE asserts that by seeking to exert some affirmative right against it by virtue of the general assignment of the executory bilateral contract in question, Reminc becomes a delegatee of Citcon's duties and is required to perform such duties under the assigned contract. USE also asserts this proposition is especially applicable in the present case inasmuch as Citcon was bought out by Reminc for $15,000.00 following confirmation of the Plan of Arrangement, after which Citcon ceased to conduct business.

The Ninth Circuit decision in *Fiberchem, Inc. v. General Plastics Corporation*, 495 F.2d 737 (9th Cir. 1974) is relied upon by USE as being on point and applicable in the instant matter in part because it deals with a subsequently insolvent assignor.[5] In that case, the assignor filed for bankruptcy and the assignee explicitly disavowed any liability upon taking the assignment. The Ninth Circuit, in finding that it was "undisputed that Rowland [assignee] purchased assets from General [Plastics] [defunct assignor] with full knowledge of Fiberchem's right to commissions," *Id.* at 738, stated:

"Although there is some dispute whether or not an assignee for value takes his claim free from the equities of third persons against the assignor, of which the assignee had no notice, there is no dispute that the assignee takes his claim subject to the equities of third parties against the assigned right where he has knowledge of such equities."

Reference is had to the dissenting opinion in *Fiberchem* authored by Judge Sneed, wherein he would have had the matter remanded to the district court to determine the question of unjust enrichment. *Id.* at 740. The majority stated that the district court judge, in his opinion, had considered the issue of unjust enrichment, thereby obviating a need to remand. USE argues that if this Court finds USE's argument to be valid, Reminc's theory that it takes the assignment without any resulting liability must be found to be without merit. To hold otherwise would not only unjustly enrich Reminc but would also create a situation of great inequity in that the Xerox Building would be improved by the elevator system installed by USE for which Reminc would be excused from all further payment.

In the instant case, Reminc had knowledge of USE's claim and to permit Reminc to receive benefits of the assignment without requiring it to accept the responsibilities clearly creates a situation of unjust enrichment as addressed by the Ninth Circuit in *Fiberchem, supra.*

The application of the rule in *Rose v. Vulcan Materials Company, supra*, is also valid here. There is no showing of an intent not to perform the responsibilities of the assignor by Reminc, and equity requires that to maintain a free and equal standard,

---

5. Reminc contends that *Fiberchem* is not applicable on the grounds that it involved the equities of a third party beneficiary (the sales agent to whom commissions were owing) rather than dealing with defenses or claims set up against an assignee by the original party to the contract under which rights were assigned.

as well as conformity in the law, that the assignee must accept the liabilities along with the benefits.

■ USE asserts that, by virtue of Citcon's assignment to Reminc, it is entitled to affirmatively recover from Reminc the remaining sums of money due and owing to it under its subcontract with Citcon. In order to recover the sums of money due under the subcontract, USE must establish that the installation of the elevator system was completed within the terms and conditions of the subcontract and the specifications for the project, and was done in a workmanlike manner.[6]

Before proceeding further, the Court must determine whether several of Reminc's witnesses should be considered experts. (Messrs. Calderone, Langelotti, Harriss, Tanner and Cork.) During the course of the trial, USE questioned whether these individuals were, in fact, experts.

The Supreme Court of Iowa in *Smith v. Cedar Rapids Country Club*, 255 Iowa 1199, 124 N.W.2d 557, 564 (1963) observed that "[o]ne of the tests for the admission of an expert opinion is whether the subject matter is such, and the witness is so qualified, as to aid the [trier of fact] in the proper determination of a question before [him]." Similarly, the Virginia Supreme Court recognizes that the knowledge to qualify a witness to speak as an expert may be derived from experience as well as by study. *Norfolk and Western Railway Company v. Anderson*, 207 Va. 567, 151 S.E.2d 628, 631 (1966).

■ A witness may testify as an expert where his opinion is derived from practical experience in an occupation which confers upon him special knowledge not within the general knowledge of the lay person. One general rule governing the admission of such testimony indicates that when a person is engaged in an occupation for a reasona-

ble time, it may be assumed that he has "the ordinary knowledge common to individuals so engaged." *State v. Brady*, 104 W.Va. 523, 140 S.E. 546, 550 (1927).

■ When a party to a proceeding proffers the testimony of a witness as that of an expert, "the lack of strong qualifications ... affect[s] the weight rather than the admissibility of the evidence." *Smith v. Cedar Rapids Country Club, supra*, 124 N.W.2d at 566. It is for the trier of fact to determine the weight to be given to the testimony of an expert witness. Accordingly, the weight given the testimony by the above-referenced witnesses for Reminc will be considered in the light of the foregoing.

A review of the record reveals that much of the evidence in the record concerns the presence and severity of a so-called "bounce" which allegedly existed in the six electric elevators following their installation by USE. The weight of the testimony reveals further that most elevators tend to bounce to some degree when they come to a landing. Testimony was had that due to height restrictions placed on the Xerox Building in the planning stages prior to construction it was necessary to put the elevator system's machine room in the basement rather than on the roof. Two witnesses for USE, Leonard Avery and John A. Miller, testified that in a building with nineteen landings (such as the Xerox Building) it is somewhat unusual to specify a basement operation elevator system. The reason given by these witnesses is that a basement machine has twice the normal hoist rope that an overhead machine would have. Testimony was also adduced to show that the wire cable (hoist rope) in a basement operation normally stretches when new and, thus, requires periodic shortening. As an elevator car is loaded and unloaded, the wire cable will stretch in order to maintain a constant tension. Therefore, neces-

---

**6.** A contractor under a construction contract implies that his work will be done in a reasonably good and workmanlike manner. A contractor undertaking a project impliedly represents that he will exercise a degree of skill necessary to complete the job he has under-

taken. *Mann v. Clowser*, 190 Va. 887, 59 S.E.2d 78 (1950). The standard which the law exacts for a contractor to meet this implied warranty is one of ordinary care and skill. *Cantrell v. Woodhill Enterprises, Inc.*, 273 N.C. 490, 160 S.E.2d 476 (1968).

sarily, the wire cable must maintain a certain degree of elasticity in order to perform its function properly.

Charles Calderone, an associate with the Transport Systems Group of Syska and Hennessy (an engineering firm), was called as a witness for Reminc. Calderone testified that the last time he examined the elevator system was in late 1976 or early 1977. Calderone acknowledged that he wrote a letter to Henry J. Brown, an architect with the firm of Grigg, Wood and Browne, dated August 26, 1976. Calderone indicated therein that Richard Langelotti, another employee of Syska & Hennessy, had visited the Xerox Building in October of 1975 and found the elevator system to be "in generally good condition". Langelotti's testimony corroborated this testimony. A later field inspection conducted in January of 1976 by Langelotti caused him to conclude that the "bounce" had improved. Langelotti further corroborated this statement in the August 26, 1976 letter, and remarked that USE "had made adjustments to the leveling controls, had lengthened the leveling, deceleration time."

Included as enclosures in Calderone's letter to Brown were letters addressed to Calderone from representatives of Montgomery Elevator Company and Otis Elevator Company. The enclosure letters reflect that both companies declined to bid on a basement operation within the specifications proposed by Syska & Hennessy which required "no bounce."[7] One of the enclosures, a letter dated June 21, 1976, from C. M. Neff, Branch Manager of Montgomery Elevator Company, states in part:

> "[T]he initial application of basement geared elevators to serve 19 floors is questionable due to the considerable

amount of travel imposed upon basement machines which were originally designed for somewhat less travel and speed. A considerable amount of hoisting cable is involved ... which readily lends itself to the bouncing of the car [as it approaches a landing] and which is due to the stretch of the cable common over such a large amount of travel."

Calderone, in stating that he forwarded these letters to Brown, acknowledged that he voiced no contrary opinion to the conclusions reached therein.

Testimony elicited that there existed a letter addressed to John Hettlemen, Vice President of Syska & Hennessy, from Otis Elevator, dated September 24, 1976. Calderone testified that he had seen this letter. He acknowledged that Otis Elevator stated therein that a basement machine operation would preclude meeting the requirement that a new elevator system would be "bounce free".

There was also testimony to the effect that the cable used by USE was not satisfactory. The specifications called for "high strength" cable. USE indicated that there would be no appreciable effect from changing the one-half inch cable in place with cable of larger diameter. Although Calderone did not agree with USE's findings, he admitted that in Westinghouse's proposal to install a new elevator system, the cables installed by USE were to be reused.[8]

As part of the record in this case is filed herein the deposition *de bene esse* of L. William Cork, Jr. By stipulation of the parties, Cork's deposition will be considered as testimony in this matter. Cork was an elevator adjuster for USE in October of 1975 when he visited the Xerox Building to

---

7. 1616 Reminc is cooperating financially with Xerox to replace the existing elevator system with an overhead operation, gearless, high-speed elevator system, to be provided by Westinghouse. Xerox is financially responsible for two-thirds of the installation costs, approximately $467,000.00.

8. Calderone stated that the trend for modern elevators was to use "extra high strength steel which is designed for 'gearless' machines."

The elevators installed by USE, however, are neither gearless nor high speed.

Miller testified that the specifications called for the use of traction-steel ropes designed for elevator service. The approved drawing indicated that high-strength traction steel ropes were provided. He also testified that Bethelehem Steel rope—styled "traction steel rope"—comports with "high strength traction steel rope" required in the specifications.

examine the elevator system. Reminc offered into evidence Defendant's Exhibit "NN", a memorandum which purports to be a typed transcript of draft notes which Cork wrote while acting as an employee of USE. USE requested that the Court reserve ruling on the admissibility of this exhibit so as to allow the Court an opportunity to make a further review of Cork's deposition.

Reviewing a deposition *de bene esse* as if it constituted live trial testimony, is somewhat difficult for the Court in that it is impossible to determine the witness's demeanor, and related matters. This is particularly true in instances where the Court must determine whether Cork exhausted his present recollection pertaining to the events encompassing his inspection of the elevator system on the Xerox Building and, if this was the case, whether it was proper to use the memorandum in question either to refresh his memory or to allow its admission as a statement of past recollection recorded.

■ Rule 612 of the Federal Rules of Evidence, as applied under Rule 917 of the Rules of Bankruptcy Procedure, governs the manner in which writings may be used to refresh the recollection of a witness while he is giving testimony. It is clear that the witness' recollection must be revived after the writing is presented to him as a stimulus so that his testimony properly constitutes a present recollection.[9] If the writing fails to revive his recollection, the writing may be read into evidence and admitted, but only if it meets the test of recorded recollection set forth in Rule 803(5) of the Federal Rules of Evidence. As McCormick aptly notes, "[t]he line between using the writing as an aid to memory and basing one's testimony upon it as a

correct record of past memory is sometimes shadowy." McCormick, *Evidence*, § 9 at 18 (1954).

■ It is the general rule that "[w]hen a party uses an earlier statement of his own witness to refresh the witness's memory . . . the party may not put the statement in evidence, although the other side may do so." *United States v. Rappy*, 157 F.2d 964, 967 (2d Cir. 1947), *cert. denied*, 329 U.S. 806, 67 S.Ct. 501, 91 L.Ed. 688 (1947), *See Portman v. American Home Products Corp.*, 201 F.2d 847, 850 (2d Cir. 1953). McCormick is in general accord with this view: "the party offering the witness may not [submit memoranda to the jury for examination] . . . and the cardinal rule is that they are not evidence, but only aids in the giving of evidence. . . ." McCormick, *Evidence*, § 9 at 18 (1954).

■ As noted by one authority, it is generally "recognized that since a record of past recollection used by a witness after verification becomes his present evidentiary statement, it may be admitted in evidence in connection with his testimony, as part of his direct examination." 29 Am.Jur.2d *Evidence*, § 877 (1967). However, a memorandum is not admissible as independent evidence to prove any fact to which the party making it could testify from his recollection. *Phoenix Insurance Company of Brooklyn v. Public Parks Amusement Company*, 63 Ark. 187, 37 S.W. 959 (1896).

■ Rule 803(5) of the Federal Rules of Evidence provides that a "memorandum . . . concerning a matter about which a witness once had knowledge" may be admitted as a "recorded recollection" only in those instances when the witness "has insufficient recollection to enable him to testify full and accurately." In addition to this requirement, a memorandum may be

---

**9.** Case law construing what constitutes the proper foundation for the admission of a writing to refresh a witness' recollection requires that the movant establish the following elements: first, the witness' recollection must be exhausted; second, the movant must establish the time, place and person to whom the writing was given; third, the Court must be satisfied that the writing accurately reflects the witness'

statements, or that the witness acknowledges the accuracy of the writing. *Goings v. United States*, 377 F.2d 753, 760 (8th Cir. 1967). Only when the Court is satisfied that these criteria have been met and "is further satisfied that it may be of help in refreshing the [witness'] memory should the witness be allowed to refer to the document." *Id.*

used as evidence only if the witness either made or adopted the memorandum with the knowledge that the facts contained therein are accurate. The determinative factor here is that Cork could not recall whether the memorandum marked for identification as Defendant's Exhibit "NN" accurately reflected what was in his draft notes. Cork stated that although he did not recall the contents of the memorandum verbatim, he did recall the general contents of the memorandum that he submitted to USE. In *United States v. Judon*, 567 F.2d 1289, 1294 (5th Cir. 1978), the Fifth Circuit held that it was error to admit a statement pursuant to Rule 803(5) where there had been no showing of the witness' insufficient recollection.

With respect to Cork's identification of the memorandum as a typed transcript of the draft notes he submitted to USE, Cork stated:

"I turned in a rough draft over five years ago, I guess. That memo was typed. I did not get a chance to proof read it and I did not sign it and I don't remember five years later if this [Defendant's Exhibit "NN"] is an exact copy of what I turned in."

Cork made the remark that "[t]his appears to be the copy of my rough draft, but I have no way of knowing if it is." The transcript of the deposition reflects that counsel for Reminc had not anticipated Cork's reluctance to adopt the memorandum as a verbatim transcript of the latter's draft notes. The transcript also reflects that the memorandum was extensively referred to by counsel.

Having had an opportunity to review Cork's testimony on the use of Exhibit "NN", and noting the admonition against receiving the memorandum as an exhibit (unless offered by an adverse party) under Rule 803(5), the Court finds that Cork did have a present ability to recall the contents of the memorandum *he* submitted to USE and, accordingly, Reminc's use of this exhibit under this Rule must be denied. Further, inasmuch as Cork was unable to adequately identify the typed draft, Reminc has not established the proper predicate for admitting it as an exhibit. Accordingly, its admission as an exhibit must be denied.

■ With respect to Cork's testimony in general, the Court will give it due consideration not inconsistent with its ruling on the weight to be given to the testimony of witnesses proffered as experts.

Reminc notes that Cork made several initial observations as to the condition of the elevator system. He stated that the cars bounced severely when approaching a landing. The cars frequently went into a mode which he termed as the "final limits". He also testified that their difficulty in handling the traffic was caused principally by slow landing-to-landing times and multiplex problems.

Cork testified that going into the "final limits" is a part of the safety circuit that stops the elevator, thus removing power from the driving machine and the door operation. He testified that "[t]he [elevator] cars hadn't been in limits at all from the second day [he] was on the job." When Cork left the job he classified the performance of the elevator system, with respect to leveling (bounce) and any final limits problem, as good.

Cork observed that the slowness of response time to passenger calls for elevator service was due to the fact that of the six elevator cars in the system, one "was under the building contractors' use and the elevator construction crews had another car out for modifications." A third elevator was frequently used by what Cork termed "building VIPs" for their personnel use. He concluded that the elevator cars were answering hall calls "in less than thirty seconds," and he considered that the multiplex control which directed the car to the hall calls was "working pretty good [sic]."

Cork's testimony further revealed that he disconnected a device known as a TMR coil, "an electrical device that operates a mechanical relay." He observed that although his action might have some effect on the machinery, it in no way "affect[ed] the safety of the passengers."

Cork testified that he was unfamiliar with the local building code. He also candidly acknowledged that much of his testimony was subject to different interpretations by engineers and other persons qualified to examine and evaluate elevator systems. Cork indicated that he had only rudimentary test equipment while at the Xerox Building. He further admitted that "[o]thers with test instruments would have a better chance" to analyze the existence of a "bounce" in the elevator cars.[10]

Leonard Avery, service sales manager for USE, testified that he inspected the elevator system in the Xerox Building over a period of five nights, six hours a night, in early 1976. He observed that construction was still continuing in the building. One car was taken out of service for use by the construction crews as a "hod hoist." As evidenced by the condition of the Xerox Building's basement machine operation, Avery testified that while construction work was in progress, the construction crews abused the elevators. The resulting dust reduced the operational effectiveness of the "door locks[,] . . . contacts and relays down in the controller."

Avery also testified that there was a water leakage problem in the machine pit which caused a motor to burn out, and that USE was not responsible for the installation of water-carrying pipes into the machine pit. Avery further testified that he had asked Theodore Gould, general partner of Reminc, whether Gould thought the bounce was objectionable. Gould, according to Avery, replied that he felt the elevators were operating in a correct manner. Avery concluded that he did not witness a bounce in the elevator system, only a "normal amount of jiggle of the floor." He found that "[t]he programming . . . [and] . . . performance times were all within industry standards."

John A. Miller was called as an expert witness by USE. He testified that he has been involved in the elevator business since 1935. Counsel for Reminc, alluding to testimony given earlier by Langelotti, asked Miller on cross-examination whether a purported oscillation of between six and eight inches by the elevator cars during floor leveling operations at landings constituted acceptable system performance. Miller indicated that such system performance, if true, would be totally unacceptable. However, based upon his examination of the system, Miller stated:

"I cannot believe under any circumstances this car could bounce as this has been described, six inches. Once the brake sets, the car remains stationary. It may oscillate a quarter of an inch or a half of an inch when the brake is set, but it is not going to bounce six inches and then drop down or bounce three inches below and then come back up again."

Miller gave testimony pertaining to the installation of overhead steel in the elevator system. The steel required for the overhead beams was originally intended to carry "overhead sheaves on shelf angles bolted through the concrete at the top of the hoist way." However, Miller testified that these specifications were changed by the structural engineer because the concrete at the top of the hoist way was not strong enough to carry the weight required of it if only shelf angles were used.

USE, in its examination of Miller, made reference to Section 1.11(A) of Plaintiff's Exhibit 12 "Section 14200 Elevators." Under the heading "Work Not Included By Elevator Contractor", Miller stated that "supports under the elevator beams" were included in this category. Such work was to be provided by the general contractor for the project. In a letter addressed to counsel for USE, dated May 7, 1976, and admitted into evidence, Miller concludes:

"This is standard practice in the elevator industry, simply because either struc-

---

**10.** Evans L. Morrison, an expert witness for USE, conducted numerous tests with equipment specifically designed to evaluate the leveling speed, passenger-carrying capacity, flight time and performance of an elevator system. Morrison testified that even though only five of the six cars in the elevator system were operating when he conducted the tests, the system was still operating in a satisfactory manner.

tural steel or re-enforced concrete hoist-way construction is always part of the general building construction...."

.  .  .  .  .

"Consequently, it is our opinion that the architect, Mr. Robert C. Smith, was negligent in failing to properly specify, detail and supervise the hoistway construction.... Therefore the cost of the additional steel beams and rods at the roof level needed to safely carry the loads of the sheave beams should not be assessed against [USE] and that they should be reimbursed for this cost."

Miller calculated that "the cost of the extra steel and rods installed would be ... $12,-800.00" and indicated that he found the elevator system in the Xerox Building "to be in compliance with the specifications and [that it met] the requirements of the Elevator Safety Code."

A review of all the evidence indicates that USE has established its work was completed according to the terms and specifications of the contract. Robert Calhoun Smith, the architect for the Xerox Building, certified the final payment and indicated that "[t]he elevator appear[ed] to be installed in accordance with the manufacturer's recommendation and shop drawings."

As to the completion of the installation in a workmanlike manner, there is considerable and conflicting testimony as to the proper functioning of the elevator cars and, in addition, the degree or existence of any so-called "bounce" of the cars when they stopped at the various floors.

In reviewing the evidence the Court finds the testimony of Evans L. Morrison and John A. Miller to be highly persuasive. Morrison, for instance, testified that he conducted extensive testing of the elevator system at the Xerox Building. In his expert opinion, Morrison concluded that as the re-leveling mode for the elevators was no more than one-half inch to one inch, there was no evidence of a releveling problem (*i. e.*, no appreciable "bounce"). Both Morrison and Miller agreed that in their opinion, as experts, the elevator system conformed to the terms and specifications of the contract. Miller concluded:

"I cannot find any way that I would consider this [bounce] to be excessive considering the fact that this is a basement machine and has twice the normal hoist rope that an overhead machine would have."

The Court is of the view that Reminc was unable to satisfactorily refute the evidence put forth by USE. Particularly noteworthy is the testimony given by one witness for Reminc, Charles Calderone. Calderone acknowledged that he had reviewed letters from Montgomery Elevator Company and Otis Elevator Company which stated, in effect, that they would not, in good conscience, place a bid on a basement operation because Reminc's "no bounce" requirement could not be met. Calderone's own testimony is clear that he voiced no objection to the conclusions arrived at by Montgomery and Otis. Furthermore, the fact that the replacement contractor for USE, Westinghouse, chose an overhead operation implicitly demonstrates the impossibility of producing a "bounce-free" basement operation.

An objective overview of all the evidence would indicate that the elevator cars were functioning within acceptable limits, taking into account use by the construction crews and other outside factors. The Court must, therefore, conclude that the work was done in a workmanlike manner and, accordingly, finds that USE is entitled to recover the balance owing to it under the contract—$125,143.09. Inasmuch as USE did not commit a breach of contract, the Court finds further that USE is relieved of any and all obligations as the principal under the dual-obligee bond with American.

The Court next examines Reminc's counterclaim which alleges that the design, construction and installation of the elevator system were materially defective resulting in damages both in terms of remedial work and to its business.

■ The evidence in a suit for breach of a construction contract must establish the existence of a contract between the parties to the suit, "the specific provisions breach-

ed, *the facts constituting the breach,* and the amount of damages resulting to [the movant] from such breach." [Emphasis in original.] *Cantrell v. Woodhill Enterprises, Inc.,* 273 N.C. 490, 160 S.E.2d 476, 481 (1968).

With respect to remedial defects, the general rule is that the proper measure of damages is usually "based on the market price of completing or correcting the performance and this will generally be shown by the cost of getting the work done or completed by another person." 3A Michie's Jur., *Building Contracts,* § 30 (1976 Replacement).

■■■■ It is also established that a defendant must plead a counterclaim in order for him to benefit from it. *McGowan v. American Pressed Tan Bark Company,* 121 U.S. 575, 7 S.Ct. 1315, 30 L.Ed. 1027 (1887), and that the party asserting a claim by way of a counterclaim "has the burden of establishing such claim." 20 Am.Jur.2d, *Counterclaim, Recoupment, Etc.,* § 152 (1965).[11]

■■■ The defendant must file a definite statement of claims with notice of it to the plaintiff. *Dermott v. Jones,* 64 U.S. (How.) 220, 16 L.Ed. 442 (1860). In an exhibit appended to the Pre-Trial Order in this proceeding, Reminc set forth certain itemized damages [12], whereby it seeks to recover damages to its business and to marketability of office space; as well as damage to its position in negotiations with building tenants. These are essentially claims for loss

of profits. Reminc also seeks to recover damages for the loss of rents and/or use of rent funds. Although this claim too devolves to an alleged loss of profits, thus falling within the purview of the Court's adoption of the ruling in *Mullen v. Brantley,* 213 Va. 765, 195 S.E.2d 696 (1973) (discussed *infra*), it will be considered separately.

The business conducted by Reminc consists of the operation of an office building where space is rented to tenants. The Court determined at trial that any assessment of damages, under a loss of profits theory, will be deemed speculative and, as such, not reasonably ascertainable when the allegedly injured party's business is new. Reminc seeks to establish a loss of profits theory for recovering damages through the testimony of Theodore Gould, a general partner of Reminc. Gould testified that of about 290,000 square feet of rentable space Xerox had rented about 203,000 square feet and a Pennsylvania firm had rented about 7,000 square feet. Thus, about one-third of the available rental space was unoccupied. Xerox and the Pennsylvania firm were the building's first tenants.

The Court relies principally upon a recent decision by the Virginia Supreme Court, *Mullen v. Brantley, supra,* in precluding the admission of evidence by Reminc under a loss of profits theory. The *Mullen* court did recognize that under certain circumstances an *ongoing* business with an *established* earning capacity may enter into evidence

---

11. It is recognized in Virginia that a party need not establish the existence of damages with mathematical precision. Rather, evidence sufficient to prove damages need only be established to a reasonable certainty or a reasonable probability. Thus, facts in a particular case must be such as to allow a reasoned and well-informed estimate of the amount of damages or loss sustained. *Holz v. Coates Motor Co.,* 206 Va. 894, 147 S.E.2d 152 (1966); *see Stevens v. Abbott, Proctor and Paine,* 288 F.Supp. 836 (E.D.Va.1968).

12. 1. Fees paid to Professionals and Contractors for remedial work:

| | |
|---|---|
| a. Grigg, Wood and Browne, A.I.A. | $12,037.75 |
| b. KCE Structural Engineers | 6,453.84 |
| c. Shefferman & Bigelson | 2,584.99 |
| d. Syska & Hennessy | 21,880.35 |
| e. Smith, Segretti & Tepper, A.I.A. | 4,281.00 |
| f. The George Hyman Construction Co. | 8,236.00 |
| 2. Diminution in Value of Elevator System (Westinghouse cost of repair) | 520,000.00 |
| 3. Increased Maintenance Expenses (Westinghouse Elevator Co.): | 88,404.00 |
| 4. Loss of Rents and/or Use of Rent Funds: | 120,000.00 |
| 5. Damage to Business and to Marketability of Office Space: | 400,000.00 |
| 6. Damage to Owner's Position in Negotiations with Building Tenants | 320,000.00 |

its records of prior and subsequent business in the absence of any other practical method by which to reach an intelligent estimate of damages caused by a disruption of the business. However, where the business is new or of recent establishment:

"[T]he rule is not applicable for the reason that such a business is a speculative venture, the successful operation of which depends upon future bargaining, the status of the market, and too many other contingencies to furnish a safeguard in fixing the measure of damages."

*Mullen v. Brantley, supra,* 195 S.E.2d at 700.

In addition, the *Mullen* court held that the "proper measure of damages could not be based upon loss of anticipated profits from an established business." *Id.*

The facts in the instant case clearly fall within the well-reasoned ruling of *Mullen v. Brantley, supra,* and, accordingly, the Court must deny the claim for damages based upon Reminc's loss of profits argument.

Reminc next asserts a claim for interest on the loss of the use of rent funds withheld by Xerox. Reminc acknowledges that although Xerox ultimately paid back the back rent it withheld, it did not pay interest on the funds so withheld.

Gould testified that the rent funds were "placed in the hands of Chicago Title as an escrow agent [in the amount of $892,000.00] and the funds were disbursed specifically against the accomplishment of the milestones in the remedial construction" in the Xerox Building. The back rent, according to Gould had accrued between "June or July of 1975, to October of 1976." No testimony was elicited from Gould as to why interest was not paid from the funds withheld by Xerox, although he did testify that the prevailing interest rates during the period in question were between eight and eleven percent.

On cross-examination, Gould acknowledged his earlier testimony in *1616 Reminc Limited Partnership v. Atchison and Keller,*

No. 75–659–A (Bkrtcy.E.D.Va. November 14, 1979), wherein he testified that:

"No space was leased until the mechanical system was completed and in operation, we entered into new leasing for the remainder of the vacant space.

.     .     .     .     .

"During the period of 1976, it was impossible to lease space in the Xerox Building because of its construction defects. The principal problem was lack of heating and air conditioning. The air conditioning wasn't as bad as the heating problem.

.     .     .     .     .

"The reason that they stopped paying rent was because the heating system had not worked during the winter and the attempts to remedy the construction defects had not been successful."

Joseph Fisher, Manager of Facility Planning and Administration Building, and Manager of the Xerox Building for Xerox, testified that his duties included the handling of "leasehold improvements, customer [and] individual complaints with the Xerox tenants in the building [and] handl[ing of] office service functions and personnel." He testified that HVAC (i. e., heating, ventilating and air conditioning) problems, leakage problems, and the elevator system were all contributing factors in Xerox's decision to withhold rent. However, Fisher candidly acknowledged that the decision to withhold rent was not his but "was made through Vice Presidential levels up through Corporate Headquarters." No testimony was elicited from any witness pertaining to what extent (or even a percentage figure) Xerox determined that the elevator, heating and air conditioning, and leakage problems acted as contributing factors in its decision to withhold rent.[13]

The Court is unable to ascertain with any reasonable certainty what USE's pro-rata share would be of the interest lost on the

---

13. Reminc did attempt to elicit such information from Fisher. However, as he had testified earlier that all decisions were made at higher management levels in Xerox, the Court sustained USE's objection to his testimony on this issue.

Xerox funds withheld from Reminc and placed in escrow. Nor can the Court fashion an award when the record upon which a decision must be based would require conjecture or unsubstantiated estimates as to what such an award for damages should be.

Reminc also seeks to recover a claim for damages allegedly caused by increased maintenance expenses. USE interposed an objection to Reminc's line of questioning on the grounds that resolution of this issue was properly one for another action based upon a breach of USE's maintenance contract with Reminc.

Rule 713 of the Rules of Bankruptcy Procedure provides that "Rule 13 of the Federal Rules of Civil Procedure [counterclaim] applies in adversary proceedings." In *United States v. American National Bank and Trust Company of Chicago*, 443 F.Supp. 167 (N.D.Ill.1977), the court held that under F.R.Civ.Proc. 13(a), the same transaction or occurrence test should be given liberal interpretation. Accordingly, the Court finds that Reminc's line of questioning on the issue of increased maintenance expenses was proper as applied under Rule 713 of the Rules of Bankruptcy Procedure.

Gould testified that Reminc terminated its maintenance contract with USE because of unsatisfactory maintenance of the elevator system and Reminc's inability to properly assess the alleged defects in the elevator system while USE continued its maintenance program under the contract. He testified that while Reminc was paying USE $1,592.00 per month prior to termination of the maintenance contract, it has been paying Westinghouse $3,210.00 per month under a new maintenance agreement. Gould estimated that as construction on a new elevator system would not be completed until June of 1980, the Westinghouse maintenance contract on the currently operating elevator system would continue until then.

The Court has examined the Maintenance Contract entered into between USE and Reminc, dated July 5, 1974, and the Maintenance Contract entered into between Westinghouse and Reminc, dated October 31, 1976. The terms and conditions in both contracts are almost identical as to the types of service provided by USE and Westinghouse to Reminc. The Court notes that neither contract provides a breakdown of monthly maintenance rates. For example, the record before the Court is silent as to the number of man hours employees of Westinghouse were to expend under its contract with Reminc. No log entries or other pertinent records are before the Court from which a rational basis could be formed for determining why Westinghouse's monthly maintenance rate was approximately twice that of USE's maintenance rate.

The Court takes cognizance of a price-adjustment clause in the Westinghouse contract which allows for an increase or decrease in the monthly rate dependent upon the "percentage of increase or decrease in the latest available wholesale Metals and Metal Products index." As many sectors of the national economy have in recent years witnessed inordinately large increases in prices of raw materials and finished products due to inflationary pressures, it is reasonable to believe that this may be one cause for the higher Westinghouse maintenance rate. Whatever the cause or causes may be, the Court will not speculate on the issue of damages when an adequate basis for compelling USE to pay the difference in the contract prices has not been established by Reminc. Accordingly, the Court finds that Reminc has not established that the amount paid to it in excess of the rate charged by USE is due specifically to acts or omissions by USE under the terms and conditions of the latter's maintenance contract with Reminc.

Reminc also seeks to establish that it is entitled to damages on the basis of certain fees allegedly paid to various professionals and contractors for remedial work. Reference is made to six firms which allegedly performed remedial work on the elevator system. One of these firms, Shefferman and Bigelson, according to Gould's testimony, never gave any advice on the elevator system.

Having examined the record, the Court is unable to determine any proper basis for

the alleged damages due to Reminc by virtue of remedial work undertaken by firms alluded to by it. Reminc did file an exhibit which purports to be an hourly service report from one of the firms, Grigg, Wood and Browne, A.I.A. However, this exhibit was not admitted into evidence. Accordingly, in the absence of appropriate testimony or other evidence to substantiate its claim for damages on this issue, the Court must deny Reminc's claim. (*See* Note 12(1)(a)–(f), *supra* at 694.)

Reminc next asserts that it is entitled to recover damages in the amount of $520,-000.00 for the alleged cost of the Westinghouse repair operation on the elevator system. In support thereof, Reminc offered into evidence a report submitted by W. F. Garrahan, District Marketing Manager for Westinghouse, dated January 25, 1977. Garrahan acknowledged that the report was a summary of other persons' opinions, and that he was not competent to give technical opinions which the report purports to do. The Court declined to admit this exhibit (Defendant's Exhibit "ZZ") into evidence.

Reference was made to a proposal Garrahan submitted on behalf of Westinghouse to Reminc for the rehabilitation of the elevator system in the Xerox Building (Defendant's Exhibit "AAA"). USE objected to the introduction of this exhibit on the grounds that Garrahan was unsure whether the proposal conformed with USE's original specifications, and that he was unsure how the various figures referred to in the proposal were formulated. The proposal itself did not give an item-by-item breakdown except for three line items in the amounts of $18,170.00; $8,525.00; and $370,954.00. No testimony was given which would assist the Court in determining the reasonableness and propriety of these sums of money for rehabilitation of the elevator system. The Court permitted the admission of the exhibit solely as "a submission of price prepared with evidence received from others" which was merely compiled by Garrahan.

In conjunction with Defendant's Exhibits "ZZ" and "AAA", the Court finds Garrahan's testimony on this issue to be insufficient to properly establish the claim of Reminc. Therefore, the Court finds that Reminc is not entitled to damages based upon the purported cost of the Westinghouse rehabilitation effort.

Accordingly, having reviewed all the evidence pertaining to Reminc's counterclaim, the Court must conclude that all claims alleged therein by Reminc be denied.

The evidence, including the testimony of Jenkins as well as Miller, establishes that the balance due on the contract to USE is $125,143.09. Accordingly, judgment will be rendered for USE in the amount of $125,-143.09, and the counterclaim of Reminc will be denied.

An appropriate order will enter.